IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JUAN LUIS LEONOR, | ) | 4:05CV3162 |
| a/k/a JUAN ARMAND, | ) | |
| | ) | |
| Petitioner, | ) | **MEMORANDUM** |
| vs. | ) | **AND ORDER** |
| | ) | |
| ROBERT HOUSTON, | ) | |
| | ) | |
| Respondent. | ) | |

As directed by the court, the parties have now fully briefed the petitioner's four remaining claims for federal habeas relief, which are designated in his amended petition (filing 12) as Grounds One, Two, Four, and Five.[1]  Upon consideration of these briefs (filings 44, 45, 47, 49) and after reviewing the state court records (filing 19), I find that the petitioner has procedurally defaulted on most of his claims of ineffective assistance of counsel (Ground One, parts A through I) and on all of his claims of prosecutorial misconduct (Ground Four, parts A though H), and that his other claims of ineffective assistance of counsel (Ground One, part J) and claims of insufficient evidence (Ground Two) and actual innocence (Ground Five) are without merit.  The petitioner's request for the issuance of a writ of habeas corpus under 28 U.S.C. § 2254 therefore will be denied, and this action will be dismissed with prejudice.

---

[1] A fifth claim (Ground Three), alleging that "Petitioner was denied the opportunity to amend his postconviction motion in the state courts, in violation of federal law and the U.S. Constitution," was dismissed sua sponte on June 1, 2006. (See filing 27.)

## INTRODUCTION

The petitioner, Juan Luis Leonor, a/k/a Juan Armand ("Leonor"), was found guilty by a jury of two counts of second-degree murder, one count of first-degree assault, and three counts of use of a deadly weapon to commit a felony, and on November 28, 2000, was sentenced by the District Court of Douglas County, Nebraska, to consecutive terms of imprisonment of 20 years to life on both murder counts, 5 to 10 years on the assault charge, and 5 to 10 years on all three deadly weapon counts.[2]  His conviction and sentence were affirmed on appeal to the Nebraska Supreme Court on February 1, 2002. *See State v. Leonor*, 638 N.W.2d 798 (Neb. 2002) (Filing 19, part 13).  The Nebraska Supreme Court's mandate was issued on February 21, 2002.  (Filing 19, part 15.)  It does not appear that a petition for writ of certiorari was filed with the United States Supreme Court.

On November 25, 2002, Leonor filed a pro se motion for new trial in the Douglas County District Court, alleging there was newly discovered evidence.  The motion was denied on December 3, 2002, and Leonor thereafter filed a notice of appeal. (Filing 19, parts 16, 18.) [3]  However, on June 27, 2003, the Nebraska Court of Appeals dismissed the appeal at Leonor's request. (Filing 19, parts 17, 19.)

On August 28, 2003, Leonor filed a pro se motion for postconviction relief in the Douglas County District Court, claiming that he had not received effective assistance of counsel at trial and on appeal, and that there had been prosecutorial misconduct.  The District Court denied the motion without an evidentiary hearing on September 10, 2003.  (Filing 19, parts 20, 22.)[4]  The Nebraska Court of Appeals

---

[2] Charges were filed in two cases that were consolidated for trial.

[3] A separate appeal was docketed in the Nebraska Court of Appeals for each District Court case.

[4] Again, two appeals were docketed in the Nebraska Court of Appeals.

2

affirmed in an unpublished decision filed on April 8, 2005.  (Filing 19, part 12.)
Leonor's petition for further review by the Nebraska Supreme Court was overruled
on June 29, 2005, and the Court's mandate was issued on July 7, 2005.  (Filing 19,
parts 21, 23.)

Leonor's original petition for writ of habeas corpus was filed in this court on
July 12, 2005.  The respondent concedes "that the petition was timely filed because
the one year limitations period under § 2244 was tolled by the petitioner's motions
for new trial and motions for postconviction relief."  (Filing 18, at 3.) [5]  More
particularly, the respondent calculates that Leonor's conviction became final, and the
statute began to run, on May 2, 2002, but also "believes that the limitations period
was tolled between November 25, 2002, . . .and June 27, 2003, . . . and between
August 28, 2003, . . .June 29, 2005[.]" [6] (Filing 18, at 3.)

_____

[5] Filing 18 is the respondent's brief in support of a motion for summary
judgment that was filed on October 3, 2005.  The motion was filed in response to an
order on initial review providing that "the respondent shall file an Answer to the
§ 2254 petition on the merits of the claims and any affirmative defenses, in the
manner contemplated by Rule 5 of the *Rules Governing Section 2254 proceedings in
the United States District Courts*, as amended effective December 1, 2004, or the
respondent may, in his discretion, limit his response to affirmative defense(s) by
filing a motion for summary judgment pursuant to Fed. R. Civ. P. 56(b)[.]"  (Filing
14, p. 2, ¶ 2 (emphasis in original).)  The respondent elected to file a motion for
summary judgment, asserting only "that the petitioner has failed to exhaust his state
court remedies."  (Filing 17.)  The court's order, however, also provided that "in
addition to any other matters, the respondent shall address the issue of timeliness of
the § 2254 petition."  (Filing 14, at 2.)  The respondent's concession was made in
compliance with this directive.  When the motion for summary judgment was denied
on June 1, 2006, the court entered a briefing order but did not require the respondent
to file an answer.  (Filing 27.)

[6] The end date is more likely July 7, 2005. *See Payne v. Kemna* 441 F.3d 570,
572 (8th Cir. 2006) (under Missouri procedure, petitioner's post-conviction relief
proceedings were "pending" for purposes of 28 U.S.C. § 2244(d)(1)(A) until the
Missouri Court of Appeals issued a mandate denying relief).

3

# DISCUSSION

"Before a state prisoner is entitled to federal habeas corpus relief, he first must exhaust his state law remedies and fairly present the facts and substance of his habeas claim to the state court." *Middleton v. Roper,* 455 F.3d 838, 855 (8th Cir. 2006), *cert. denied*, 127 S.Ct. 980 (2007).  To satisfy the "fairly present" requirement, the petitioner must have "refer[red] to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in the . . . state court." *Id.* (quoting *Abdullah v. Groose*, 75 F.3d 408, 411-12 (8th Cir. 1996) (en banc)).  "[I]f no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default' (or actual innocence, . . .)." *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005), *cert. denied,* 126 S.Ct. 1351 (2006) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

With respect to the decisions rendered by the Nebraska Supreme Court on February 1, 2002, and the Nebraska Court of Appeals on April 8, 2005, I am bound by their fact findings unless a decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  Additionally, I must presume that a factual determination is correct unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  A conclusion of law set forth in a decision on the merits of a claim must also be accepted, and a writ of habeas corpus cannot be granted by me, unless the conclusion reached by the Nebraska Supreme Court or Nebraska Court of Appeals "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

4

***Evidence Presented at Trial***

Leonor was convicted of first-degree assault and use of a deadly weapon based on the testimony of two eyewitnesses that he fired several shots through the window of a restaurant on November 20, 1999, striking a rival gang member in the leg. The same weapon was used two days later to fatally shoot the driver of a vehicle, causing it to crash into a light pole; a passenger in the vehicle was killed in the collision. Several witnesses saw the vehicle being chased by another vehicle from which shots were being fired. Leonor admitted to several people that he was the driver of the second vehicle, and that his passenger had done the shooting. Leonor was convicted as an aider and abetter on the two second-degree murder charges and two additional charges of use of a deadly weapon.

A more detailed summary of the evidence was provided in the Nebraska Supreme Court's opinion on Leonor's direct appeal:

1. November 20, 1999, Incident

On November 20, 1999, Omaha police officer Angela Baker was called to the area of 21st and Q Streets in Omaha, at approximately 12:51 a.m. The nature of the call was a shooting at the La Loma Café, where it was believed that a Hispanic male had been shot in the leg. The victim was identified as Jose Silva, a member of the "Lomas XIII" street gang.

Silva testified that he was with his girl friend, Rhonda Ponce, at the La Loma Café sometime after midnight on November 20, 1999, when three individuals entered the restaurant. The three individuals, one of whom he identified as Rodolfo Chavez, a member of the "Surenos" street gang, got their food and left. Three to five minutes after Chavez and his companions left the restaurant, Silva heard gunshots coming from his left, near the front door. He jumped up, covered Ponce, threw her down on the floor, and got down on the floor himself. He realized that he had been shot only after he hit the floor. It was stipulated at trial

5

that the wounds involved a substantial risk of death and a substantial risk of permanent disfigurement.

Two persons who were with Leonor that evening testified that they saw Leonor shoot into the La Loma Café. Chavez testified that there was a discussion between Leonor and David Gonzales, also known as Creeper, in Chavez' presence about who was going to do the shooting. Leonor then shot three or four times through the window of the La Loma Café.

Gerardo Ortiz, who was also present, testified that he saw Leonor shoot through the window of the La Loma Café three or four times. Ortiz testified that the reason Leonor shot Silva was that a person named "Speedy," who was with Ortiz and Leonor, said Silva had shot his mother. Ortiz also testified that after the shooting, several persons, including Leonor, went to Ortiz' apartment. At that time, Leonor mentioned losing his pager. Officer Bruce Ferrell was one of the investigating officers at this shooting. Ferrell found a Uniden digital pager on the curb approximately 70 to 90 feet northeast of the La Loma Café. This pager was determined to be rented to Leonor.

### 2. November 22, 1999, Incident

Officer Kimberly Woolery was working in the early morning hours of November 22, 1999, and received a call at 1:32 concerning shots fired in the area of 20th and Q Streets. En route, Woolery overheard a second call of a car accident in the area of 20th and N or M Streets. She went to the scene and observed that a black car had struck a light pole. She saw a single male occupant unconscious in the driver's seat. Woolery observed that the driver's-side window had been shattered, but held intact by the tinting, with a small hole just above the door lock. She opened the door and noticed a matching hole in the driver's upper back. From this, Woolery determined that the driver had been shot. She determined that the identity of the driver was Miguel Medrano. Medrano later died at the hospital where he had been taken.

Officer Craig Wylie was also on the scene that morning. At approximately 5 a.m., Wylie was approached by three teenagers who

6

notified him of a body in the alley to the east. Wylie then went to the alley and noticed a Hispanic female. The victim was identified as Sylvia Valadez.

Witness Antoniette Gomez stated that she was with Valadez and Medrano on the evening of November 21, 1999, at the Guaca Maya restaurant. She testified that she, Valadez, and Medrano left the Guaca Maya restaurant at closing time and went to Medrano's home. They remained at Medrano's for a few minutes, then Medrano and Valadez left together in Medrano's car. Gomez last saw Medrano and Valadez at approximately 1:30 a.m. driving toward 20th Street.

Dr. Jerry W. Jones performed autopsies on Valadez and Medrano. Valadez died as a result of blunt trauma injuries that were consistent with a car accident. According to Jones, Valadez probably remained alive and conscious for several minutes after the accident. The cause of Medrano's death was concluded to be a penetrating gunshot wound to the left side of the chest, which perforated the apex of the upper lobe of the left lung and severed the common carotid and the left subclavian arteries.

There were several individuals in the neighborhood who testified as to what they saw and heard in the early morning hours of November 22, 1999. Michael Jacobs testified that he saw two cars speeding north down 20th Street at around 1:30 a.m., with one man hanging out the passenger-side window of the car that was following the first car. He saw that man fire one shot, and he heard at least two other shots after the cars were no longer in his field of vision. Jacobs described the car from which shots were fired as dark colored with silver or chrome wheels. When shown a picture of Leonor's car, exhibit 64, Jacobs identified it as similar to or consistent with the car that gunshots were fired from.

Roy Nelson testified that he heard two or three gunshots, a "car scream around 20th and Q going north on 20th," with another car behind it, and three more gunshots. He testified that the gunshots were coming from the rear car, which he described as a dark sports car, possibly a Trans Am. Nelson was shown exhibit 64 and testified that it was very similar to the car he saw gunshots fired from on November 22, 1999.

7

Abel Diaz was standing outside of his car on 20th and N Streets and observed a black car being chased by a light brown car. He heard five or six gunshots and saw the shots coming from the passenger side of the second car, which was chasing the first car. Diaz then saw the first car crash into the light pole. Diaz was also shown exhibit 64 and stated that the taillights on the second car looked like the taillights on the car depicted in the exhibit.

Several of Leonor's fellow gang members testified as to what they observed on the morning of November 22, 1999. Ortiz testified that he was with a group of people watching television at his apartment on the evening of November 21. Around 1 a.m. on November 22, Ortiz' roommate received a call from Leonor and Gonzales, who said that they were coming over to the apartment from the Guaca Maya restaurant. About 10 minutes later, Ortiz and the others at his apartment heard gunshots coming from 20th and Q Streets. Ortiz' apartment is located on the corner of 20th and P Streets. About 10 minutes after hearing the gunshots, Leonor and Gonzales arrived at the apartment. They were drunk and laughing. Leonor told Ortiz that he and Gonzales had shot someone who had thrown a Lomas gang sign at them. He also stated that he had been driving and that Gonzales did the shooting.

Jose Hernandez was present at Ortiz' apartment on the evening of November 21, 1999. He remembers Leonor and Gonzales calling at about 11 p.m. or 12 a.m. to say they were coming over. Hernandez later heard three to five gunshots coming from around 20th and Q Streets and went outside to see what had happened. Ortiz and his roommate went outside too. They could not see where the shots came from, so they went back inside the apartment. About 5 to 15 minutes later, Leonor and Gonzales appeared outside the apartment. Leonor was carrying Gonzales, who was very intoxicated, and Gonzales was waving around a 9-mm gun, pointing it at Hernandez.

Leonor told Hernandez that the gun was not loaded because the last bullet had been fired. Once they got into the apartment, Leonor explained that they were coming from the Guaca Maya restaurant and that Gonzales "wanted something to go on with his gun." They were driving down Q Street, and Gonzales shot his gun two or three times.

8

Leonor then told Hernandez that he and Gonzales saw a bald-headed man in a black car, who got "paranoid" when they all looked at each other at a four-way stop sign. Leonor got in front of the bald man's car to block his way. When the bald man tried to reverse, Leonor reversed and got right beside him. Gonzales then shot his gun at the man. Leonor next raced the bald man's car down the street until it crashed.

Arthur Carter testified that he had been incarcerated with Leonor in the Douglas County Correctional Center in February 2000. According to Carter, Leonor told him about the shooting of Medrano's car because he was seeking Carter's advice as to possible sentences. Leonor told Carter that he and another person were out "looking for the enemies," when they saw a black car and began to follow it "aggressively." Leonor also told Carter that he was driving and that his friend was in the passenger seat. Leonor's friend began shooting at the other car while at an intersection. They chased the car south, shooting at it, until the car hit a pole.

Omaha Police Department crime laboratory technician Daniel Bredow testified that the shell casings collected from the shootings of Silva and Medrano matched. They were both 9-mm casings which had been fired from the same weapon. Ortiz testified that the 9-mm gun belonged to Leonor.

*Leonor*, 638 N.W.2d at 802-804.

### *Ground One*

Leonor first claims that he "was denied the effective assistance of appellate and trial counsel in violation of the 6th and 14th Amendments to the U.S. Constitution[.]" (Filing 12, at 6.)  In particular, he alleges that:

A.    "Trial counsel failed to investigate and present testimony at trial of Omaha Police investigators Teresa Negron . . . and Anthony Strong[.]" (Filing 12, at 6.)  Leonor argues that these officers would have testified that the two murder victims were not gang members.

9

B.   "Trial counsel failed to investigate and prepare properly for trial; specifically to read and review the documents disclosed by the government which contain potentially exculpatory materials." (Filing 12, at 12.)  Leonor argues that his attorney should have elicited testimony from Antoinette Gomez that one of the murder victims, Sylvia Valadez, had made "some girl" jealous by dancing with her boyfriend, who drove a blue van; one of the investigating officers testified that he had observed a blue van with a male driver and a female passenger near the crime scene.

C.   "Trial counsel failed to interview and call to testify Humberto Gonzalez-Soto and Jose Zamarripa." (Filing 12, at 15.)  Leonor claims that these individuals were with the two murder victims and witness Gomez on the night in question, but that Gomez's testimony did not disclose this fact.

D.   "Trial counsel failed to object to confusing jury instructions, which misled the jury and eliminated the possibility of a conviction for aiding and abbetting [sic] in manslaughter." (Filing 12, at 20.)

E.   "Trial counsel failed to object to non-corrected false testimony when counsel was aware of it under Napue v. Illinois." (Filing 12, at 22.)  Leonor claims that Gerardo Ortiz, who testified about both incidents, lied when he said that he had not made a deal with the State in exchange for his testimony and had not been convicted within the last 10 years.

F.   "Trial counsel was ineffective for his failure to utilize information obtained and [i]n his possession in order to prevent prosecutorial misconduct." (Filing 12, at 24.)  Leonor again complains that evidence was not used to show that neither murder victim was a gang member.

G.   "Trial counsel failed to object at trial to the false testimony presented by the state's attorney in order to gain credibility of Hernandez." (Filing 12, at 25.)  Leonor claims that Jose Hernandez falsely testified that Leonor had confessed to the November 22nd shooting incident "right away," which is contrary to what Hernandez had told police.

10

H.   "Trial counsel failed to object at trial . . . [about] the prosecutorial misconduct of presenting false testimony."  (Filing 12, at 27.)  Leonor claims that Gerardo Ortiz lied when he testified that he was not a gang member, but only hung out with them.

I.   "Appellate counsel failed to raise on appeal prosecutorial misconduct of the presentation of false testimony; and failed to investigate and object to the same."  (Filing 12, at 29.)  Leonor complains that Jose Hernandez, while admitting that he was receiving a plea agreement on a theft charge in exchange for his testimony, falsely denied that there was also a deal that he would not be charged as an accessory to murder.

J.   "Trial counsel failed to impeach the credibility of Hernandez and Ortiz with prior inconsistent statements."  (Filing 12, at 31.)

On appeal from the denial of his motion for postconviction relief, Leonor failed to make specific assignments of error regarding his claim of ineffective assistance of counsel.  Instead, he only vaguely claimed that:

1).   The district court abuse its discretion in failing to provide postconviction review of issues raised in the defendant's postconviction motion (motion), asserting factual allegations which, if proved, constitute an infringment of the defendant's rights under the state and federal constitution, thus erroneously applying state v. al-zubady, 263 Neb. 595 (2002), and state v. leonor, 263 Neb. 86 (2002).[7]

2).   The district court abused its discretion in adjudicating the postconviction motion filed by the defendant, it failed in faithfully discharging its inherent duty and responsability accord Neb.Rev.Stat. § 29-3001 (reissue 1995), to wit, review the motion and the files and records of the case for would be deemed as constituting an infringment of the defendant's rights under the state and federal constitution, and

_____

[7] In State v. Al-Zubaidy, 263 Neb. 595, 641 N.W.2d 362 (2002), the Nebraska Supreme Court affirmed the denial of a motion for postconviction relief involving claims of ineffective assistance of counsel.

11

grant a hearing/prompt hearing thereon–on issues the district court may discover on its own accord through its summary review-determine the issues and make factual findings of fact and conclusions of law with respect thereto.

3).  The district court abuse its discretion in tis conclusion that even if there was an prosecutorial misconduct or that trial counsel was ineffective there was still sufficient evidence i.e., overwhelming evidence to convict the defendant and that this court has recognized the strenght of evidence in the defendants case.

5).  The district court abused its discretion in failing to appoint a counsel to the defendant, whose petition presents a justiciable issues to the district court for postconviction determination, and the defendant being indigent, is entitled to appointment of counsel.

4).  The district court abused its discretion by failing to grant the defendant a motion for leave to amend for his post conviction motion.

(Filing 19, part 7, p. 3 (numbering, spelling, punctuation and grammar as in original).)

In considering Leonor's claim that the Douglas County District Court erred in denying his motion for post conviction relief, the Nebraska Court of Appeals "first observe[d] that in his argument in support of this assignment of error, Leonor raises a number of allegations regarding his trial counsel's performance and prosecutorial misconduct, none of which are assigned as error, some of which were not addressed in his motion for postconviction relief, and many of which could have been raised on direct appeal."  (Filing 19, part 12, p. 6.)  After citing applicable authority, the court then stated that it would "decline to address issues that were not raised in Leonor's postconviction motion and were not both assigned as error and argued in Leonor's briefs on appeal[, and] . . . also decline to address issues that were known to Leonor and which could have been litigated on direct appeal."  (Filing 19, part 12, p. 7.)  As a result, the only attorney-performance issue to be addressed on the merits by the Nebraska Court of Appeals "involve[d] assertions that [Leonor's] trial counsel did not impeach witnesses Hernandez and Ortiz adequately."  (Filing 19, part 12, p. 8.)  In

12

other words, the Nebraska Court of Appeals for procedural reasons limited its review of Leonor's ineffective assistance of counsel claim to the issue which is now alleged in Leonor's amended habeas petition as part J of Ground One (*i.e.*, "Trial counsel failed to impeach the credibility of Hernandez and Ortiz with prior inconsistent statements."). As to this claim, the Nebraska Court of Appeals stated:

> [A] review of the trial record shows that trial counsel was familiar with these witnesses' prior inconsistent statements to police and utilized those inconsistencies during cross-examination. Trial counsel elicited testimony from these witnesses that clearly placed their credibility at issue. Leonor ignores certain testimony from these witnesses on direct examination that raises questions as to the credibility of these witnesses. Leonor fails to establish how further questioning of these witnesses on cross-examination as to certain issues would have led to a different trial outcome.

(Filing 19, part 12, p. 8.)

Leonor does not allege that the Nebraska Court of Appeals erred in its finding of fact that Leonor's attorney had impeached both Hernandez and Ortiz with prior inconsistent statements. His only claim is that additional questions should have been asked in order to establish that the testimony of these cooperating witnesses was not believable. The Nebraska Court of Appeals disposed of this argument by concluding that Leonor had not been prejudiced by any alleged deficiency in his attorney's trial performance; that is to say, the court directly applied the second prong of the United States Supreme Court's well-established standard in *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (holding that a convicted defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense). To establish prejudice under *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Because the Nebraska Court of Appeals' finding of no prejudice is reasonable and is consistent

with the *Strickland* test, Leonor is not entitled to any federal habeas relief on Ground One, part J.

All other parts of Ground One are procedurally defaulted, either because they were not specifically assigned as error in Leonor's brief on appeal or because they were not alleged in his motion for postconviction review in the district court.[8] Even though the Nebraska Court of Appeals considered the witness impeachment issue absent a specific assignment of error, it is a well-established rule in Nebraska that "[t]o be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error." *State ex rel. Lemon v. Gale*, 721 N.W.2d 347, 361 (Neb. 2006); *Cole v. Isherwood*, 716 N.W.2d 36, 42 (Neb. 2006); *White v. White*, 709 N.W.2d 325, 337 (Neb. 2006).[9] It is also the rule in Nebraska that "[a]n appellate court will not consider as an assignment of error a question not presented to the district court for disposition through a defendant's motion for postconviction relief." *State v. Taylor*, 716 N.W.2d 771, 774-75 (Neb.App. 2006); *State v. Caddy*, 628 N.W.2d 251, 257 (2001). The Nebraska Court of Appeals' decision thus fully disposes of Leonor's first habeas claim. A federal court "is prohibited from reviewing an issue that the state court has

---

[8] Although not expressly stated by the Court of Appeals, the failure to raise a claim of ineffective assistance of counsel on direct appeal is not a procedural bar to a motion for postconviction relief unless the defendant was represented by different counsel on appeal. *See State v. Molina*, 713 N.W.2d 412, 447 (Neb. 2006) ("Under Nebraska law, in order to raise the issue of ineffective assistance of trial counsel where appellate counsel is different from trial counsel, a defendant must raise on direct appeal any issue of ineffective assistance of trial counsel which is known to the defendant or is apparent from the record, or the issue will be procedurally barred on postconviction review."). Leonor's trial attorney handled his direct appeal.

[9] The Nebraska Supreme Court has also held that a "litigant proceeding on a pro se basis is obligated to follow the same appellate rules and procedures applicable to counsel." *Cole*, 716 N.W.2d at 42.

14

resolved on an adequate and independent state ground, including procedural default." *Clay v. Norris*, 485 F.3d 1037, 1039 (8th Cir. 2007).

Regarding Leonor's claim of ineffective assistance of appellate counsel in failing to assert on direct appeal that the prosecutor knowingly presented false testimony by Jose Hernandez (part I of Ground One), I find no discussion of this claim in the brief that Leonor submitted to the Nebraska Court of Appeals.[10]  "If a procedural default is the result of ineffective assistance of trial or direct appeal counsel, in a matter external to the defense and imputed to the state, the Sixth Amendment requires that the default be excused.  *Taylor v. Bowersox*, 329 F.3d 963, 971 (8th Cir. 2003) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  "In such an instance, constitutionally deficient performance of appellate counsel is 'cause' to forgive a procedural default. . . .  But the exhaustion doctrine requires that a claim for ineffective assistance of counsel be initially 'presented to the state courts as an independent claim before it may be used to establish cause for a procedural default' in a federal habeas proceeding."  *Id.* (quoting *Murray*, 477 U.S. at 489) (footnote omitted).  In this case, the claim is now exhausted by procedural default because Leonor has already had one complete round of appellate review of his motion for postconviction relief.  Nebraska courts "will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Moore*, 718 N.W.2d 537, 542 (Neb. 2006).  *See also Akins v. Kenney*, 410 F.3d 451, 456 n. 1 (8th Cir. 2005) (treating unexhausted claims as procedurally defaulted where there is no presently available state court remedy).

---

[10] Leonor alleges in his amended habeas petition that the issue was presented at pages 37 and 38 of his brief to the Nebraska Court of Appeals.  (Filing 12, at 30.)

*Ground Two*

Second, Leonor claims that "the evidence was insufficient to sustain each of Petitioner's convictions beyond a reasonable doubt in violation of due process under the United States Constitution; Jackson v. Virginia." (Filing 12, at 40.) This claim was presented on Leonor's direct appeal, and the Nebraska Supreme Court reviewed each of his convictions to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Leonor*, 638 N.W.2d at 805. This is the same due process standard that was applied by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).[11]

The Nebraska Supreme Court's findings of fact and conclusions of law were as follows:

> Viewing the evidence in a light most favorable to the State demonstrates that there is ample evidence supporting Leonor's convictions for his actions on November 20, 1999. Both Chavez and Ortiz testified that they actually saw Leonor shoot through the window of the La Loma Café early in the morning on November 20. No witnesses refuted that testimony. Therefore, we determine that the State produced sufficient evidence that the jury could have found, beyond a reasonable doubt, that Leonor was guilty of the crimes of first degree assault and use of a deadly weapon to commit a felony in the November 20 incident.
> . . .
>
> While no eyewitnesses placed Leonor by name in the car that was doing the chasing and from which the shots were being fired [on November 22, 1999], there was the following evidence:

---

[11] The Supreme Court held in *Jackson* that "[a] challenge to a state conviction brought on the ground that the evidence cannot fairly be deemed sufficient to have established guilt beyond a reasonable doubt states a federal constitutional claim." 443 U.S. at 322.

16

(1) Witnesses Jacobs and Nelson identified the car doing the chasing and from which the shots were fired as being similar to Leonor's car.

(2) Witness Gomez was with Medrano and Valadez at the Guaca Maya restaurant. She testified Medrano and Valadez left together in Medrano's car at 1:30 a.m., driving toward 20th Street. A police officer, Woolery, at 1:32 a.m., received a radio call, and on her way to answer this radio call, came upon the accident where Medrano's car had hit the pole. Therefore, this testimony places Valadez in Medrano's car.

(3) The pathologist, Jones, testified that Valadez died as a result of blunt trauma from the car accident.

(4) Jones testified that Medrano's death was from a gunshot wound to the left side of his chest.

(5) The gun which shot Medrano was the same gun that had shot Silva in the November 20, 1999, incident.

(6) Fellow gang member, Ortiz, testified that in the early morning hours of November 22, 1999, he was in his apartment and heard gunfire from the corner of 20th and Q Streets. Ortiz testified that about 10 minutes later, Leonor and Gonzales arrived at his apartment and that Leonor told Ortiz that he and Gonzales had shot someone who had thrown a Lomas gang sign at them. Leonor said he was driving and Gonzales was shooting.

(7) Hernandez, who was also present in Ortiz' apartment in the early morning hours of November 22, 1999, recalled hearing gunshots from 20th and Q Streets. Hernandez testified that about 5 to 15 minutes later, Leonor and Gonzales arrived at the apartment, and that Gonzales was waving around a 9 mm gun. Leonor stated the gun was not loaded because the last bullet had been fired. Leonor told Hernandez that he and Gonzales were driving down Q Street, that Gonzales had shot his gun two or three times, and that they saw a bald-headed man in a black car

17

who got paranoid when they all looked at each other at a four-way stop sign. Leonor got in front of the bald man's car to block his way. When the bald man tried to reverse, Leonor reversed and got right beside him. Gonzales then shot his gun at the man. Leonor next raced the bald man's car down the street until it crashed.

(8) Carter testified that he had been incarcerated with Leonor in the Douglas County Correctional Center in February 2000, when Leonor told him about shooting at Medrano's car. Leonor told Carter that he and another person were out "looking for the enemies" when they saw a black car and began to follow it "aggressively." Leonor stated that he was driving and that his friend was in the passenger seat. His friend began shooting at the other car while at an intersection. They chased the car south, shooting at it, until the car hit a pole.

. . .

We determine that the evidence was sufficient to support the guilty verdicts. The evidence showed that Leonor told Ortiz that he and Gonzales had shot someone who had thrown a Lomas gang sign at them; Leonor told Carter in the Douglas County jail that he and another person were out "looking for the enemies" when they began to follow the victim's car aggressively and chased the victim's car, shooting at it, until the victim's car hit a pole. Therefore, Leonor is guilty as an aider and abettor in the deaths of both Medrano and Valadez.

. . .

The evidence was sufficient to convict Leonor of both counts of use of a deadly weapon to commit a felony, even if Leonor never fired a shot. . . .

. . . Leonor drove the car in a manner which enabled Gonzales to repeatedly shoot at Medrano's car by blocking Medrano in at the intersection and then chasing Medrano down the street. Leonor aided and abetted the second degree murders of Medrano and Valadez, and the crime of use of a deadly weapon to commit a felony is a natural and probable consequence of those crimes. Therefore, we conclude that the

evidence is sufficient to convict Leonor of the use of a deadly weapon to commit a felony charges.

We determine that the evidence adduced at trial, when viewed and construed in a light most favorable to the State, was sufficient to support Leonor's convictions on all charges stemming from his actions on November 22, 1999.

*Leonor*, 638 N.W.2d at 806-08.  Leonor has failed to demonstrate that these findings and conclusions are unreasonable in any respect.  Accordingly, Ground Two of his habeas claim will be denied on the merits.

### *Ground Four*

Leonor next alleges that he "was denied the effective assistance of appellate and trial counsel in violation of the Sixth, 5th, and 14th Amendments to the United States Constitution, violating Petitioner's rights to due process and fair trial[,]" because:

A.   "Trial and appellate counsel failed to investigate documents [in their] possession and object and [bring] as an error on appeal the prosecutorial misconduct of the state's attorney['s] use of false testimony and evidence."  (Filing 12, at 52.)  Leonor claims that a witness gave false testimony regarding the location where a spent shell casing was found.

B.   "Trial and appellate counsel failed to object, investigate and [bring] as an error the prosecutorial misconduct of the state's known use of false testimony of [its] witness Carter."  (Filing 12, at 59.)  Leonor complains that Arthur Carter falsely testified that he had not made a deal with the State in exchange for his testimony.

C.   "Trial counsel and appellate counsel failed to object and [bring] as error the prosecutorial misconduct of the state's known use of false testimony of [its] witness Rodolfo Chavez."  (Filing 12, at 63.)  Leonor claims that Chavez also lied about not making a deal with the State.

19

D.   "Trial counsel failed to object [to] and investigate . . . the prosecutorial misconduct which deprived Petitioner to confronted testimony under Brady v. Maryland and Crawford v. Washington." (Filing 12, at 66.) Leonor complains that Arthur Carter falsely testified that Leonor had drawn him a map of the November 22nd crime scene, which was then corroborated by a police officer who testified that the drawing had been misplaced during renovations at the police station.

E.   "Trial counsel was ineffective for conceding Petitioner's guilt to the jury and his failure to object to the prejudicial statements made by the state's attorney during closing and opening arguments, and to make the closing arguments part of the record." (Filing 12, at 70.)

F.   "Trial counsel failed to call as a witness Mr. Pedro Chavez, Marisela Cabrera, and George Balenegro, [whose] testimony would have been admissible." (Filing 12, at 73.) Leonor claims that these individuals, who include the owner of the restaurant where the first shooting took place, a restaurant employee, and a restaurant customer, would have contradicted the testimony of Gerardo Ortiz and Rodolfo Chavez concerning events that preceded the shooting.

G.   "Trial counsel was ineffective for his failure to investigate David Gonzalez [sic], Valerie Green, and police reports that were [in] his possession and to call for a continuance of trial, until counsel provided an adequate investigation of the case; and to investigate police officers Ferrell and McCowen." (Filing 12, at 76.) Leonor claims that David Gonzales told Valerie Green that he had chased after the Medrano vehicle and done the shooting, but that he did not mention Leonor's involvement.

H.   "The state's attorney violated Petitioner's rights by presenting one theory of the case in Petitioner's trial and a different theory at the . . . [trial of Petitioner's] co-defendant[.]" (Filing 12, at 89.) Leonor claims that the State argued at David Gonzales's trial that he had mistaken

20

Medrano for a rival gang member, but in his trial had led the jury to believe that the murders were gang-related.

Insofar as Leonor claims ineffective assistance of trial counsel with respect to these issues, this claim is procedurally defaulted for the same reasons that were discussed in Ground One, parts A through H. Leonor's further claim that counsel was ineffective for failing to raise these issues on direct appeal is also procedurally defaulted because this claim was not included in Leonor's assignments of error on appeal from the denial of his motion for postconviction relief, and he does not allege any newly discovered evidence of prosecutorial misconduct. See my discussion of part I of Ground One.

Viewing Ground Four strictly as a prosecutorial misconduct claim, it is also procedurally defaulted. No such claim was presented on Leonor's direct appeal, and on his appeal from the denial of his motion for postconviction relief the Nebraska Court of Appeals confined its review to Leonor's allegations that Jose Hernandez and Gerardo Ortiz had provided testimony at trial that the State knew was inconsistent with their prior statements. The Nebraska Court of Appeals stated:

> With regard to his claims of prosecutorial misconduct, Leonor essentially asserts that the prosecutor presented false testimony because she elicited testimony from witnesses supporting a conclusion that Leonor was guilty as charged. In other words, Leonor asserts that the prior inconsistent statements of certain witnesses were 'the truth' and should have been presented at trial. We see nothing however in the trial record, Leonor's postconviction motion, or his briefs on appeal to support a conclusion that the prosecutor knowingly presented false testimony. The prosecutor presented testimony acknowledging and explaining prior inconsistent statements, and these issues of credibility were further explored on cross-examination by Leonor's counsel. Finally, as observed by the district court and as noted above, the instances of alleged prosecutorial misconduct were known to Leonor and could have been raised on direct appeal. We decline to review these issues further in this postconviction appeal.

(Filing 19, part 12, p. 10.)  This finding of procedural default by the Nebraska Court of Appeals bars federal habeas review of all issues raised in Ground Four.  To the extent that the court's opinion addresses the merits of the prosecutorial misconduct alleged in parts E, G, H, or I of Ground One (which are framed as ineffective assistance of counsel issues), Leonor has failed to demonstrate that the court was wrong to find no evidence that the prosecutor knowing presented of false testimony.

In any event, the test for prosecutorial misconduct has two parts: "(1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial."  *United States v. Hernandez*, 779 F.2d 456, 458 (8th Cir. 1985); *Stringer v. Hedgepeth*, 280 F.3d 826, 830 (8th Cir. 2002) (habeas petition has burden of establishing that the outcome of his trial probably would have been different but for the prosecutor's misconduct).  The Nebraska Court of Appeals made an express finding that Leonor was not prejudiced by any alleged prosecutorial misconduct, stating:

> Leonor asserts that the district court erred in concluding that, even if there was prosecutorial misconduct or ineffective assistance of counsel, Leonor was not prejudiced thereby.  In support of this assignment of error, Leonor again raises issues that were not raised in his postconviction motion, were not assigned as error, and/or could have been raised on direct appeal.  We decline to address those issues in the present appeal.  In his direct appeal, Leonor assigned as error and argued that the evidence adduced at trial was insufficient to find him guilty of any of the crimes charged beyond a reasonable doubt.  The Nebraska Supreme Court concluded that the evidence, when viewed in a light most favorable to the State, was sufficient to convict Leonor on all counts.  See *State v. Leonor*, 263 Neb. 86, 638 N.W.2d 798 (2002).  Through his postconviction motion, Leonor has essentially sought to relitigate the issue of the sufficiency of the evidence against him at trial.  We find no error in the district court's conclusion that Leonor was not prejudiced by the alleged misdeeds of the prosecutor and Leonor's trial counsel complained of by Leonor in his postconviction motion.  Leonor has presented pages of conclusions of fact and law but no actual

evidence to support a conclusion that the outcome of the trial would have been different absent the acts of which he complains.  Leonor's assignment of error is without merit.

(Filing 19, part 12, pp. 12-13.)  Again, Leonor has failed to show that the Nebraska Court of Appeals was wrong to reach this conclusion.

### *Ground Five*

Finally, Leonor "alleges that in light of all the evidence presented in this petition (that was not presented at trial) Petitioner establishes actual innocence[.]" (Filing 12, at 91.)  Regardless of whether the so-called "evidence" presented in Leonor's amended petition was presented at trial, it was all available to him at the time of trial.  The fundamental-miscarriage-of-justice ("actual innocence") exception to the procedural default rule "requires a habeas petitioner to present *new evidence* that affirmatively demonstrates that he is innocent of the crime for which he was convicted."  *Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2006) (emphasis supplied); *Wadlington v. United States*, 428 F.3d 779, 783 (8th Cir. 2005) ("To establish a valid claim of actual innocence, [a habeas petitioner] must 'support his allegations of constitutional error with new reliable evidence . . . that was not presented at trial,' and demonstrate 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).[12]  Also, "[t]his standard is strict; a party generally cannot demonstrate actual innocence where there is sufficient evidence to support a conviction."  *Wadlington*, 428 F.3d at 783.  "In order to establish a valid claim of actual innocence, a defendant must show factual innocence, not simply legal insufficiency of evidence to support

---

[12] "An actual innocence claim is 'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  *Wadlington*, 428 F.3d at 783 (quoting *Schlup*, 513 U.S. at 315).

a conviction." *McNeal v. United States*, 249 F.3d 747, 749 (8th Cir. 2001).  Leonor has not met this heavy burden.

## CONCLUSION

Leonor's claim of ineffective assistance of trial and appellate counsel is procedurally defaulted except to the extent that he has alleged that his attorney failed to impeach the credibility of Jose Hernandez and Gerardo Ortiz with their prior inconsistent statements; as to that allegation, however, the state courts' finding of no prejudice is controlling.  Leonor has also procedurally defaulted on his claim of prosecutorial misconduct.  His remaining claims of insufficient evidence and actual innocence are without merit.

Accordingly,

IT IS ORDERED that Leonor's amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 is denied in all respects.  A final judgment of dismissal shall be entered by separate document.

July 5, 2007.                    BY THE COURT:

                                 s/ *Richard G. Kopf*
                                 United States District Judge

24